UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x
GJEKOTE CURANAJ,                             :
                                             :              OPINION AND
            Plaintiff,                       :              ORDER
                                             :
      v.                                     :              10-CV-5689 (ER)
                                             :
PETER CORDONE, DEBORAH CORDONE,              :
SERGEANT THOMAS GENTNER, OFFICER             :
SAMUEL SANSONE, CHIEF DANIEL                 :
MCMAHON, and the TOWN of YORKTOWN,           :
                                             :
            Defendants.                      :
————————————————————————x

RAMOS, D.J.:

      Gjekote Curanaj and his family have fought for several years with their neighbors, Peter

and Deborah Cordone, over their shared driveway in Yorktown, New York (the "Town").  The

dispute escalated into a confrontation on September 4, 2008, in which Mr. Cordone alleged Mr.

Curanaj threatened him while carrying an ax.  The Town police arrested Mr. Curanaj and

charged him with Menacing in the Second Degree and later added charges of Criminal

Possession of a Weapon in the Fourth Degree and Harassment in the Second Degree.  A jury

acquitted Mr. Curanaj of all of the charges.

      Mr. Curanaj then brought this action pursuant to 42 U.S.C. § 1983 and New York state

law against the Cordones, the Town, and three Town police officers, Sergeant Thomas Gentner,

Officer Samuel Sansone, and Chief Daniel McMahon (collectively "the Officers"), alleging false

arrest, malicious prosecution, selective prosecution, and malicious abuse of process claims.  The

Cordones and the Town Defendants alleged crossclaims against each other in the event they were

found liable.  Each of the Defendants moved for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure 12(c).  For the reasons set forth below, the Court GRANTS judgment to Defendants on the federal claims against them.  The Court declines to retain supplemental jurisdiction over the state law claims and dismisses the crossclaims.

## I. BACKGROUND

### A. Facts

### 1. Events Prior to the September 4, 2008 Confrontation

Plaintiff Gjekote Curanaj lives next door to and shares a common driveway with Defendants Peter Cordone and Deborah Cordone in the Town.  Compl. ¶¶ 4-5.  Since 2006, the Curanaj and Cordone families have had continuing disputes over their shared driveway.  *See id.* ¶¶ 11-18.  These disputes have frequently resulted in one or the other family making a complaint to the police and other Town agencies.  For example, Mr. Curanaj alleges that, in August 2007, he reported Mr. Cordone to the Town for parking commercial vehicles on the shared property, and Town officials advised Mr. Cordone that he was in violation of Town ordinances but took no further action.  *See id.* ¶ 11.  Around October 2007, Mr. Curanaj filed a civil action against the Cordone family for interfering with his use of the shared driveway.  *Id.* ¶ 13.

Mr. Curanaj alleges that the Cordones filed a series of baseless complaints against him in retaliation for the lawsuit.  *Id.* ¶ 14.  On December 19, 2007, the Cordones' daughter Casey complained to the Town police that Mr. Curanaj had trespassed on their driveway.  *Id.*  The police responded, but told the two families the matter should be resolved civilly.  *Id.*  On April 16, 2008, Deborah and Casey Cordone allegedly attempted to file a harassment charge against Mr. Curanaj, but the police again took no criminal action.  *Id.*  Mr. Curanaj further alleges that, on June 2, 2008, Mr. Cordone called the police to report a vehicle blocking his driveway, and, on

June 16, 2008, "an unknown caller" made a similar complaint.  *Id.*  On July 5, 2008, the

Cordones again complained that a vehicle was blocking their driveway.  *Id.*  The police

responded and again urged the families to find a civil resolution.  *Id.*  In each of these incidents,

Mr. Curanaj alleges, the Cordones specifically told the Town police about the civil lawsuit Mr.

Curanaj had filed against them.  *Id.* ¶ 15.

   On August 10, 2008, the families had another confrontation which resulted in Mr.

Curanaj complaining to the police.  *See id.* ¶¶ 16-17.  Mr. Curanaj alleges that Mr. Cordone had

his dog run onto the Curanaj property and jump up on Mr. Curanaj and Mr. Curanaj's wife and

daughter.  *Id.* ¶ 16.  Mr. Curanaj responded by telling Mr. Cordone that he would kill the dog if

necessary to protect his family.  *Id.*  Mr. Curanaj alleges that Mr. Cordone then threatened to kill

him.  *Id.*  Mr. Curanaj then called the police and "opined that [Mr.] Cordone let the dog run over

and jump on them because of the ongoing lawsuit between them."  *Id.* at 17.  The police took no

action.  *Id.*

   A police report entered that day by an officer not named in this lawsuit states that each of

Mr. Curanaj and Mr. Cordone claimed that the other had threatened to kill him.  Declaration of

Mark A. Radi in Support of Motion to Dismiss ("Radi Dec."), Ex. C.

   Two days later, on August 12, the Curanaj family again complained to the Town police

about the incident, but were referred to an animal control officer, who informed them that a

summons would be issued.  Compl. ¶ 18. Mr. Cordone allegedly received this summons on

September 13, 2008.  *Id.*

### 2. September 4, 2008 Confrontation and Immediate Aftermath

   On September 4, Mr. Cordone allegedly released two dogs in a fenced-in area of his

property while Mr. Curanaj was walking with his daughter down the common driveway.  *Id.* ¶

19.  While there is no dispute that the dogs were on the Cordone's property, or that they were securely fenced in, the area was apparently close enough to scare Mr. Curanaj's daughter, and when Mr. Curanaj asked Mr. Cordone to control the dogs, he allegedly refused.  *Id.* ¶¶ 19-20. Mr. Curanaj alleges that, "[a]t the time, [he] had been carrying an ax to bring it to the woodpile at the bottom of the driveway, his daughter's school bag and holding his daughter's hand.  At no time did [he] threaten [Mr.] Cordone with harm, raise the ax or waive it."  *See id.* ¶ 20.  Mr. Cordone, however, called the police, and, according to Mr. Curanaj, said he was "having troubles with [his] neighbor again."  *Id.* ¶ 21.[1]

Police Sergeant Thomas Gentner and Officer Samuel Sansone responded to the scene. *Id.* ¶ 22.  Mr. Curanaj alleges that Mr. Cordone told the police that Mr. Curanaj had approached him "and while five feet away raised the ax, began waving it around and stated: 'I'll take care of you and your dogs and whoever else.'"  *Id.*; *see also* Radi Dec., Ex. E (police report of the incident).[2]  When questioned at the scene, Mr. Curanaj denied that he had threatened Mr. Cordone and explained that he only had the ax in his hands because he was chopping wood.  *Id.* ¶ 23.  Mr. Curanaj alleges that the police found the ax in the woodpile and that Mr. Cordone admitted having heard Mr. Curanaj chop wood earlier.  *Id.*  Sergeant Gentner arrested Mr. Curanaj.  *Id.* ¶ 24.

---

[1] Mr. Curanaj was not present on the phone call between Mr. Cordone and the police, but was provided with the police report of the call.  *See* Radi Dec., Ex. E.  The Court treats this document as incorporated by reference into the Complaint.  *See Kamholtz v. Yates Cnty.*, 350 F. App'x. 589, 592 (2d Cir. 2009) ("Documents plaintiffs either possessed or knew about and upon which they relied in bringing the suit may be incorporated.  When a plaintiff chooses not to attach to the complaint or incorporate by reference a document which is integral to the complaint, the defendant may produce it when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." (quotations, citations, brackets, and ellipses omitted)).

[2] *See supra* note 1.

4

Mr. Curanaj alleges that, while in police custody, Sergeant Gentner "stated in substance that he now had [Mr. Curanaj] under arrest and even if the Cordones were lying or making things up he was going to throw [Mr. Curanaj] in jail."  *Id.* ¶ 25.

In a police report entered that day, Officer Sansone stated that Mr. Cordone had told him at the scene that "[Mr. Curanaj] raised the ax and began waving it around and stated, 'I'll take care of you and your dogs and whoever else.'"  Radi Dec., Ex. E.  He also stated that Ms. Cordone "informed [him] that she witnessed the entire incident."  *Id.*

Officer Sansone, with Sergeant Gentner as a witness, executed a misdemeanor information against Mr. Curanaj on the charge of Menacing in the Second Degree.  Compl. ¶ 28. The information states that Mr. Curanaj "display[ed] a deadly weapon . . . while waving an ax in his hand and while saying I'll kill you and your dogs and anyone else who tries to stop me, which placed the victim in reasonable fear of physical injury."  Affidavit of Kim Berg in Opposition ("Berg Aff.") to Motion to Dismiss, Ex. C.[3]

Mr. Cordone stated in a deposition supporting the information on the day of the incident that Mr. Curanaj had "raised the ax in his hand and waved it and said I'll kill you and your dogs and anyone else that try's [*sic*] to stop me."  Radi Dec., Ex. F.[4]  In a separate deposition, Ms. Cordone stated that she heard Mr. Curanaj say "that he would kill [Mr. Cordone] and the dogs and kept on screaming and hollering and told [Mr. Cordone that he was] going to have an awful life.  [Mr. Curanaj] had an ax in his hand the whole time.  It started down and came up to a point

---

[3] Mr. Curanaj incorporates this document by reference in his Complaint.  *See* Compl. ¶ 28.

[4] Mr. Curanaj incorporates this document by reference in his Complaint.  *See* Compl. ¶¶ 26-27 (referring to and characterizing allegations in the Cordone depositions).

[*sic*] he was holding it a short way over his head, [*sic*] he was holding up while he was verbally threatening" Mr. Cordone. *Id.*, Ex. G.[5]

Mr. Curanaj claims that these "supporting depositions were not only materially false but also contained allegations that were inconsistent with their initial reports to the police." Compl. ¶ 27. Mr. Curanaj was formally charged, and at his arraignment he was ordered to have no contact with the Cordones. *Id.* ¶ 29.

### 3. Events Subsequent to the September 4, 2008 Confrontation

Mr. Curanaj alleges that, between his arrest and his trial, "the Cordones continued to maliciously pursue a series of baseless claims against" him and his wife. *Id.* ¶ 32. He raises five specific incidents. First, on September 16, 2008, the Cordones allegedly complained to the Town Board about work Mr. Curanaj was doing on his property, which ultimately led the Town to require that he install a dry well. *Id.* Second, around September 19, 2008, the Cordones allegedly contacted the local riverkeeper about work on Mr. Curanaj's property. *Id.* Third, on October 4, 2008, the Cordones contacted the police over a new dispute involving the driveway and Officer "Sansone advised [Sergeant] Gentner of the situation[,] and they concluded it was a civil matter." *Id.* Fourth, in October 2008, the Cordones allegedly contacted the Department of Environmental Protection over Mr. Curanaj's work on the property, but the Department took no action. *Id.* Fifth, around April 29, 2009, the Cordones allegedly filed a complaint against the Curanajs with Child Protective Services, which the agency allegedly determined was "unfounded." *Id.*

Over the same period, the Curanaj family repeatedly filed complaints against the Cordone family on which the police allegedly took no action. *See id.* ¶ 33. On September 16, 2008, the Curanajs complained about the Cordones interfering with the driveway by digging up an

---

[5] *See supra* note 4.

irrigation line. *Id.* In December 2008, the Curanajs complained that Mr. Cordone had taken gravel that the Curanajs had bought for the driveway onto his property. *Id.* Upon hearing that complaint, Sergeant Gentner allegedly threatened Mr. Curanaj with arrest for violation of the no contact order. *Id.* Mr. Curanaj further alleges that, at some point around this time, an unknown person who identified himself as a friend of the Cordones threatened him, and, when he reported the incident to the police, he was told that the police were "sick and tired" of responding to his complaints. *Id.*

On September 12, 2009, Ms. Curanaj asked Casey Cordone's boyfriend to remove his car from the shared driveway and he allegedly responded with a series of racial slurs. *See id.* Mr. Curanaj alleges that, when his wife reported this incident to the police, she was threatened with prosecution if she pursued the charges. *Id.* She pressed charges nonetheless. *Id.* The police arrested the boyfriend. Radi Dec., Ex. H.[6] Finally, Mr. Curanaj sought to convince the Town board to sanction the Cordones for illegally parking commercial vehicles on the shared driveway, but the charges were dismissed. *Id.*

Mr. Curanaj finally alleges that, "[o]n at least three occasions in early to mid 2009," the Curanajs raised concerns with Chief McMahon, who once responded that the disputes were civil in nature and twice ignored their complaints. *Id.* ¶ 36. Mr. Curanaj alleges that Chief McMahon's actions were "part of the policy and practice of Defendant Town to treat citizens differently on account of who they know and/or their national origin." *Id.* ¶ 37.

On February 12, 2009, Officer Sansone swore out a superseding misdemeanor information, which included the initial charge of Menacing in the Second Degree and added Criminal Possession of a Weapon in the Fourth Degree and Harassment in the Second Degree.

---

[6] "[I]t is well established that a district court may rely on matters of public record in deciding a motion to dismiss." *Parks v. Town of Greenburgh*, 344 F. App'x. 654, 656 (2d Cir. 2009) (quotation omitted).

*See* Berg Aff., Ex. C.[7]  Mr. Curanaj alleges that the information included "fabricated allegations."  Compl. ¶ 34.  The information stated that Mr. Curanaj "did wave an ax in his hand in front of Peter Cordone while saying, 'I'll kill you and your dogs and anyone else who tries to stop me,' thereby placing the victim in reasonable fear of physical injury."  Berg Aff., Ex. C.

On December 3, 2009, a jury found Mr. Curanaj not guilty of the criminal charges.  *Id.* ¶ 35.

### B. Procedural History

On July 27, 2010, Mr. Curanaj filed the instant action.  He alleged six causes of action against the Defendants jointly: (1) a Fourth Amendment false arrest claim; (2) a New York common law false arrest claim; (3) a Fourth Amendment malicious prosecution claim; (4) a New York common law malicious prosecution claim; (5) a Fourteenth Amendment selective prosecution claim; and, (6) a Fourth Amendment malicious abuse of process claim.  *Id.* ¶¶ 39-50.

The Town and the Officers answered and asserted crossclaims against the Cordones in the event of liability.  The Cordones answered and likewise asserted crossclaims against the Town and Officers in the event of liability.  The Officers filed an amended answer adding the defense of qualified immunity.

On February 17, 2012, the Town and Officers moved to dismiss pursuant on Federal Rule of Civil Procedure 12(c).  On February 21, 2012, the Cordones likewise moved to dismiss under Rule 12(c).

---

[7] Mr. Curanaj incorporates this document by reference in his Complaint.  *See* Compl. ¶¶ 34.

**II. DISCUSSION**

**A. Standard for Rule 12 (c) Motions**

The Second Circuit has held that "the standards for dismissal pursuant to Rule 12(c) are the same as for a dismissal pursuant to Rule 12(b)(6) . . . and the standard set . . . for evaluation of the viability of the pleading is the same under each Rule." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011).

On a motion to dismiss a complaint under Rule 12(b)(6), district courts are required to accept as true all factual allegations and to draw all reasonable inferences in the plaintiff's favor. *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). However, this requirement does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (same). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

**B. Background Law on Section 1983**

In this case, Mr. Curanaj alleges two causes of action under New York common law and four causes of action under 42 U.S.C. § 1983.  In order to state a claim under Section 1983, a plaintiff must allege that:  (1) a right secured by the Constitution or federal law was violated by defendants; and (2) the alleged violation was committed by a person acting under color of state law.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

"Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  Thus, a civil rights action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law.  *Id.*

**C. Federal Claims against the Officers**

**1. Qualified Immunity**

Officers Gentner, Sansone, and McMahon have raised the defense of qualified immunity. "A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (citations, brackets, ellipses, and quotation omitted).

The Second Circuit recently explained that "[q]ualified immunity thus affords government officials breathing room to make reasonable—even if sometimes mistaken—

decisions, and protects all but the plainly incompetent or those who knowingly violate the law from liability for damages." *DiStiso v. Cook*, No. 10–4304–cv, — F.3d —, 2012 WL 3570755 at *10 (2d Cir. Aug. 21, 2012) (citations and quotations omitted). Therefore, "[w]hether qualified immunity applies in a particular case generally turns on the objective legal reasonableness of the challenged action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (citations and quotations omitted).

The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Under a qualified immunity analysis, "[f]irst, a court must decide whether the facts that a plaintiff has alleged . . .  make out a violation of a constitutional right," *id.*, and then "[s]econd, if the plaintiff has satisfied this first step, whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* The Supreme Court has allowed "district courts . . . to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

### 2. False Arrest

Mr. Curanaj brings a false arrest claim against the Officers under the Fourth Amendment. Compl. ¶ 40, 42. The Second Circuit has explained that a Section "1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). In *Jaegly*, the panel stated that, "[i]n analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." *Id.* "To state a claim for false arrest under New York law, a plaintiff must show that

(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quotation omitted).

The Parties do not dispute that Mr. Curanaj has satisfied the first three elements.  They disagree only on whether the confinement was privileged because the Officers had probable cause to arrest.  "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d. at 152.  The Second Circuit has explained that "[a]n officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quotation omitted).

Because the Officers have raised qualified immunity as a defense, they need not demonstrate that they had *actual* probable cause to arrest.  The Second Circuit has stated, "in the context of allegations of false arrest, that an arresting officer is entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (quotation and brackets omitted).  This more lenient standard has become known as "arguable probable cause." *See id.; see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (applying arguable probable cause in a false arrest analysis).

Mr. Curanaj was charged after his arrest with Menacing in the Second Degree. *See, e.g.*, Compl. ¶ 28; Berg Aff., Ex. C.[8]  Under New York law, "[a] person is guilty of menacing in the second degree when . . . [h]e or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon."  N. Y. Penal Law §120.14 (McKinney 2012).

Mr. Curanaj's Complaint alleges that Mr. Cordone told the police at the scene that Mr. Curanaj had approached Mr. Cordone "and while five feet away raised the ax, began waving it around and stated: 'I'll take care of you and your dogs and whoever else.'"  Compl. ¶ 22.  This allegation alone establishes that the Officers had information indicating that Mr. Curanaj "display[ed] a deadly weapon" and that, by threatening to "take care of" Mr. Cordone, Mr. Curanaj likely intended to put him in "reasonable fear of physical injury."  *See* N. Y. Penal Law §120.14 (McKinney 2012).

The Officers claim that Mr. Cordone's statement constituted "reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that [Mr. Curanaj] ha[d] committed . . . a crime." *Jaegly*, 439 F.3d at 152 (quotation omitted).  They note that the Second Circuit has stated that "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).

---

[8] It is not necessary that the Officers show that they had (actual or arguable) probable cause to arrest Mr. Curanaj on the *Menacing* charge.  "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly*, 439 F.3d at 153.

But Mr. Curanaj argues in opposition that "there exists sufficient basis from which the jury could reasonably conclude that Defendants did not have probable cause since they lacked reasonably trustworthy information to arrest" him.  Def.'s Mem. at 15-16.  Specifically, he claims "there is ample proof showing serious doubt as to the Cordones' veracity."  *Id.* at 16.

The facts in the Complaint demonstrate that Defendants had arguable probable cause to arrest Mr. Curanaj because the circumstances reinforce, rather than raise doubts about, the victim's veracity.  On September 4, 2008, the Officers knew that the Curanajs and Cordones had made repeated complaints against each other.  In fact, on August 10, 2008, less than a month before the incident, Mr. Curanaj had alleged that Mr. Cordone had released a dog on Mrs. Curanaj and the Curanaj's daughter.  Compl. ¶ 16.  During this same incident, Mr. Curanaj—as he concedes in his Complaint—had threatened to "kill the dog if necessary" *id.*, and each of Mr. Curanaj and Mr. Cordone claimed that the other had threatened to kill him.  Radi Dec., Ex. C.

So when Mr. Cordone told the police that Mr. Curanaj had approached him "and while five feet away raised the ax, began waving it around and stated: 'I'll take care of you and your dogs and whoever else,'" Compl. ¶ 22, this claim was consistent with Mr. Curanaj's earlier admitted threat to kill the Cordone dog and the two families' history of making violent threats against one another.

When they arrived at the scene, the Officers found the ax that Mr. Cordone had claimed Mr. Curanaj had displayed, *id.* ¶ 23, and Mr. Curanaj admitted having carried the ax.  *Id.*  Mr. Curanaj emphasizes that Officer Sansone conceded at trial that his investigation was possibly incomplete, *see* Pl.'s Mem. at 11, but it was sufficiently complete to establish arguable probable cause.  Officers are "not required to explore and eliminate every plausible claim of innocence before making an arrest."  *Jaegly*, 439 F.3d at 153.

14

Mr. Curanaj offers in his Complaint, as an alternative theory for why he was holding the ax while speaking with Mr. Cordone, that he was chopping wood.  That fact, apparently conceded by Defendants, is completely irrelevant to the determination that the police had to make.  That he was using the ax either before or after the altercation for some innocent purpose does not preclude its use unlawfully during the altercation.  Moreover, "a comparable showing [of reliability] is not needed to establish veracity when the information comes from an average citizen who is in a position to supply information by virtue of having been a crime victim."  *Lee v. Sandberg*, 136 F.3d at 103 (approvingly quoting *State v. Amarillo*, 503 A.2d 146, 161 (Conn. 1986)).

Mr. Curanaj primarily relies for his argument on two cases, *Mistretta v. Prokesch*, 5 F.Supp. 2d 128 (E.D.N.Y. 1998), and *Weintraub v. Bd. of Educ. of City of New York*, 423 F.Supp. 2d 38 (E.D.N.Y. 2006).  *See* Pl.'s Mem. at 13, 11-12.

In *Mistretta*, the court stated that "officers are not absolutely privileged to arrest upon a charge by any private individual who claims to be a victim," noting that "[s]ome people have axes to grind."  5 F. Supp. 2d at 133.  "Thus, there is a caveat to the general rule:  victim complaints ordinarily establish probable cause absent circumstances that raise doubts as to the victim's veracity."  *Id.*  (quotation omitted).  The court continued, "[t]he most common situation in which such doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation.  When such a relationship exists, and is known to the arresting officer before the arrest is made, the complaint alone may not constitute probable cause; the officer may need to investigate further."  *Id.*

The facts of *Mistretta* are in some ways analogous to this case.  In *Mistretta*, "[t]he complaint was made by one spouse against another in the midst of divorce proceedings."  *Id.* at

134.  Here, the complaint to the police was made by one family against another in the midst of a civil lawsuit and a long-running dispute between the two.

In *Weintraub*, the court denied summary judgment to two school administrators on a false arrest claim.  *See* 423 F. Supp. 2d at 56.  The administrators had reported to police that one of their teachers had assaulted another and the accused teacher filed charges against them.  *Id.* at 41.  The court explained that "[i]f a jury were to believe [the plaintiff's] account, . . . it would reasonably infer that [the defendant] knew [the plaintiff] had not assaulted her, but nonetheless intended to have him arrested by making false statements to the police."  *Id.* at 56.

The *Weintraub* Court reasoned:

[G]iven [the defendant's] role in supporting the prior exaggerated allegation of abandonment [that one of the administrators] levied against Weintraub, [the administrators'] pattern of filing unsubstantiated charges against Weintraub, and the fact that [the alleged victim] returned to the school and went to [one of the administrator's] office to report the alleged crime, rather than contacting the police directly, there is more than a modicum of evidence on which a jury could infer the intent of [the administrators] to have Weintraub falsely arrested.

*Id.*

Mr. Curanaj finds the facts and reasoning of *Weintraub* closely analogous.  He argues:

The basis for the Court's holding in *Weintraub* was, like here, that: (1) the parties had a history of numerous incidents where baseless accusations had been made by the civilian against plaintiff which ultimately culminated in the allegation of a stabbing leading to plaintiff's arrest for assault; and (2) plaintiff denied any assault so if the jury reasonably believed plaintiff it would find that the civilian made false statements to the police.

Pl.'s Mem. at 11.

Neither *Mistretta* nor *Weintraub* defeat the defense of arguable probable cause on the facts of this case.  In *Weintraub*, the accuser claimed that the plaintiff had "stabbed her in the back with a pencil" while the plaintiff "denied that there was ever any physical contact between the parties," and there was no physical evidence to corroborate the accuser's claim.  423 F. Supp.

2d at 46.  Thus, in *Weintraub*, it was plausible that the accuser had fabricated her account of the

assault.  But in this case, as in *Mistretta*—a case in which the court ultimately found that the

defendant officer had probable cause to arrest, 5 F. Supp. 2d at 135—the Officers "did not

simply accept the accusation at face value," but investigated by interviewing the parties and

finding physical evidence to support the accuser's claim.  *See id.*  Mr. Curanaj did not deny that

he had the ax during what was indisputably a confrontation, *see* Compl. ¶ 23, which gave the

Officers reason to believe that the crime of Menacing in the Second Degree had been committed.

Notwithstanding the history of bad blood between the Parties, the Officers could not be

expected to turn a blind eye to a plausible allegation of the threat of physical violence.  *See*

*Fernandez v. City of New York*, No. 02 Civ.8195 (JGK), 2003 WL 21756140 (S.D.N.Y. July 29,

2003) (explaining that, even though two families had a history of disputes, "faced with . . .

allegations of physical violence, it is unreasonable to suggest that the police should merely turn a

blind eye.").  Therefore, Mr. Curanaj's version of the facts as alleged in the Complaint

establishes at the very least that "officers of reasonable competence could disagree on whether

the probable cause test was met."  *Lee*, 136 F.3d at 103 (quotation and brackets omitted).  The

Court GRANTS judgment to the Officers on the federal false arrest claim.

### 3. Malicious Prosecution

Prior to his criminal trial, the state filed a superseding indictment against Mr. Curanaj to

include charges of Criminal Possession of a Weapon in the Fourth Degree and Harassment in the

Second Degree.  *See* Berg Aff., Ex. C.  Mr. Curanaj brings a malicious prosecution claim against

the Officers under the Fourth Amendment.  Compl. ¶ 44, 46.  As with false arrest claims under

Section 1983, the Second Circuit has looked for the elements of federal malicious prosecution

claims in state law.  "Under New York law, [t]he elements of an action for malicious prosecution

are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino*, 331 F.3d at 72 (quotation omitted).

As with false arrest claims, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Id.* Because the Officers have raised qualified immunity as a defense, all they need to show is that they had arguable probable cause. *See Jaegly*, 168 F. App'x at 481-82 (applying the arguable probable cause standard in a malicious prosecution case in which the defendants raised qualified immunity as a defense).

The issue of arguable probable cause for the malicious prosecution claim is identical to the issue of arguable probable cause for the false arrest claim. Thus, as to the Menacing charge, the Officers had arguable probable cause and cannot be held liable for malicious prosecution of that charge. The additional charges, Criminal Possession of a Weapon in the Fourth Degree and Harassment in the Second Degree, have to be analyzed separately. "Defendants here must have had probable cause for *each* charge for which Plaintiff was prosecuted." *Rodriguez v. New York City Police Dept.*, No. 10 Civ. 891(BSJ) (THK), 2011 WL 5057205 at *5 (S.D.N.Y. Oct. 24, 2011) (noting the holding in *Fulton v. Robinson*, 289 F.3d 188, 197 (2d Cir. 2002), that a plaintiff who was "arrested on multiple charges but convicted on only one may proceed with a claim for malicious prosecution on the charge on which he was not convicted.").

New York law provides that "[a] person is guilty of criminal possession of a weapon in the fourth degree when, [*inter alia*] . . . [h]e possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N. Y. Penal Law § 265.01 (McKinney 2012). Crucially, for the charge of criminal possession of a weapon in the fourth degree, "the element of intent to use a dangerous instrument unlawfully can be presumed from a finding that defendant

possessed a dangerous instrument." *People v. Campbell*, 86 A.D. 2d 403, 405 (N.Y.A.D. 2d Dep't 1982).

There is no dispute between the Parties that Mr. Curanaj possessed a dangerous instrument.  From that fact, the intent element is satisfied.  So there can be no dispute that the Defendants had arguable probable cause on the charge of Criminal Possession of a Weapon in the Fourth Degree.

On the final charge, New York law provides that "[a] person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person, [inter alia] . . . [h]e or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same."   N. Y. Penal Law § 240.26 (McKinney 2012).

The superseding misdemeanor information states that Mr. Curanaj "display[ed] a deadly weapon . . . while waving an ax in his hand and while saying I'll kill you and your dogs and anyone else who tries to stop me, which placed the victim in reasonable fear of physical injury." Berg Aff., Ex. C.  According to the Complaint, Mr. Curanaj denied that he had threatened Mr. Cordone.  Compl. ¶ 23.  But there is no dispute that the Cordones told the police that Mr. Curanaj had threatened Mr. Cordone.  In addition, as explained above, the circumstances he alleges in the Complaint support the determination made by the Officers.

Again, at a minimum, "officers of reasonable competence could disagree on whether the probable cause test was met," thus establishing that the Officers had arguable probable cause to charge Mr. Curanaj.  *Lee*, 136 F.3d at 103 (quotation and brackets omitted).  Accordingly, the Court GRANTS judgment to the Officers on the federal malicious prosecution claim.

### 4. Selective Prosecution

Mr. Curanaj alleges that the Officers engaged in selective prosecution against him, thereby violating his Fourteenth Amendment rights.  Compl. ¶ 48.

"To succeed in an action alleging selective prosecution, plaintiffs in this Circuit have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004).

It is not obvious whether Mr. Curanaj is alleging that the differential treatment was based on impermissible considerations or on bad faith.  In his Complaint, Mr. Curanaj makes a passing reference to an alleged Town policy of "treat[ing] citizens differently on account of who they know and/or their national origin."  Compl. ¶ 37.  But he pleads no facts indicating that the Officers' actions were motivated by considerations of national origin or the like.  He does not even plead his national origin.

The only references in the Complaint to such considerations are a statement in a police report that the August 10, 2008 dog attack was "Anti-Islamic (Muslim)," *see id.* ¶17, and racial slurs attributed to Casey Cordone's boyfriend during the September 12, 2009 driveway incident.[9] *See id.* ¶ 33.  Casey Cordone's boyfriend is not a named Defendant, and the August 10, 2008 police report, without any other supporting facts, casts no doubt on the Officers' motivations.  If anything, the report suggests that the Officers were sensitive to, rather than motivated by, racial or religious animus.

---

[9] Mr. Curanaj does allege that Casey Cordone's boyfriend said "things would be 'better if there were no Albanians in this country,'" Compl. ¶ 33, and does allege that Deborah and Casey Cordone complained he yelled at them in a "foreign language."  *Id.* ¶ 14.

Instead, as Mr. Curanaj states in his opposition, he is alleging "that he was treated differently in comparison with the Cordones—both residents on Hayes drive who made complaints to the Yorktown police."  Pl.'s Mem. at 26.  But Mr. Curanaj ignores the one critical fact indicating that he was not similarly situated to the Cordones when he was prosecuted—that the Officers only acted after a confrontation in which Mr. Curanaj, and not Mr. Cordone, held a weapon.  In addition, and running directly contrary to his assertions of unequal treatment, the police arrested Casey Cordone's boyfriend after his confrontation with Mrs. Curanaj, an incident that occurred one year *after* Mr. Curanaj's arrest.  *See* Radi Dec., Ex. H.

Perhaps more telling are the series of complaints the Cordones made when the Officers *chose not to act*.  They did not act on Casey Cordone's December 19, 2007 trespass allegation.  Compl. ¶ 17.  They also did not act on Deborah and Casey Cordone's April 16, 2008 harassment allegation.  *Id.*  They did not act again on the July 5, 2008 driveway allegation.  *Id.*  Finally, on August 10, 2008, when each of Mr. Curanaj and Mr. Cordone claimed that the other had threatened to kill him, the Officers did not act on either threat allegation.  Radi Dec., Ex. C.

The facts alleged in the Complaint indicate not that the Officers selectively prosecuted allegations against the Curanajs, or that they even favored the Cordones over the Curanajs, but that they urged both families to resolve their many disputes civilly and only prosecuted when Mr. Curanaj escalated the dispute by bringing a dangerous weapon to a confrontation.

In addition, the allegations in the Complaint fail to establish that the Cordones were treated differently because of "who they know."  In the first instance, the Cordones are not alleged to "know" anyone in the Town government.  Moreover, Mr. Curanaj alleges that the Cordones made a series of complaints to a variety of Town agencies—the "local riverkeeper,"

the Department of Environmental Protection, and Child Protective Services—which resulted in the Cordones receiving no satisfaction.

Mr. Curanaj has failed to allege the necessary element of differential treatment in his selective prosecution claim against the Officers. Therefore, the Court GRANTS judgment to the Officers on the selective prosecution claim.

### 5. Malicious Abuse of Process

Mr. Curanaj alleges that the Officers committed a malicious abuse of process against him by filing the criminal charges, thereby violating his Fourth Amendment rights. *See* Compl. ¶ 50. The Second Circuit analyzes malicious abuse of process claims under Section 1983 by reference to state law. *Savino*, 331 F.3d at 76. Under New York law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.* (quotation omitted).

"In the criminal context, malicious abuse of process is by definition a denial of procedural due process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (quotation and citation omitted). Mr. Curanaj appropriately bases his malicious abuse or process claim on the filing of the criminal misdemeanor information. *See* Pl.'s Mem. at 24. The deficiency of his claim lies elsewhere.

The Circuit has been clear that "a malicious motive alone does not give rise to a cause of action for abuse of process." *Savino*, 331 F.3d at 77 (quotation omitted). "In order to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper *purpose* in instigating the action." *Id.* (emphasis added). "[T]o state a claim for abuse of criminal

22

process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.*

Mr. Curanaj may have identified a collateral objective *for the Cordones*. He claims that they filed "the criminal charge against him for purposes of using that against [him] in the driveway lawsuit." Pl.'s Mem. at 24. But he does not identify a legally sound collateral objective for *the Officers*. The only objective he identifies for the Officers is "retribution." *See* Pl.'s Mem. at 25.

The facts in the Complaint do not support Mr. Curanaj's claim that the Officers filed criminal charges to seek retribution against him. The Complaint cites numerous instances in which the Officers chose not to act in against Mr. Curanaj the face of allegations made by the Cordones both before and *after* the September 2008 arrest. For example, the Officers chose not to initiate criminal charges based on (1) the Cordones' December 19, 2007 trespass complaint, *see* Compl. ¶ 14; (2) on Mr. Cordone's report that Mr. Curanaj had threatened to kill him on August 10, 2008, *see id.* ¶ 17; Radi Dec., Ex. C; or (3) on what Sergeant Gentner allegedly perceived to be Mr. Curanaj's violation of the no contact order in December 2008. *See id.* ¶ 33. With respect to each of these events, the Officers chose not to file criminal charges against Mr. Curanaj when they could possibly have done so.

But even if the Officers did seek retribution against Mr. Curanaj, the claim still fails. For a malicious abuse of process claim, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77. Therefore, the Court GRANTS judgment to the Officers on the malicious abuse of process claim.

### D. Federal Claims against the Cordones

In order to state a claim under Section 1983, a plaintiff must allege a violation committed by a person acting under color of state law.  *Sullivan*, 526 U.S. at 49-50.  The Cordones are plainly not state agents, but "to act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State."  *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).  Instead, "[i]t is enough that [the defendant] is a willful participant in joint action with the State or its agents.  Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions."  *Id.* at 27-28; *see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (explaining that private conduct is only considered state action when "[t]he State has so far insinuated itself into a position of interdependence with [a private party] that it must be recognized as a joint participant in the challenged activity.").

"[I]n order for private conduct to qualify as state action, the state must be more than a passive victim of an individual's wrongful conduct.  There must be either a symbiotic relationship between the state and the defendant, such as, for example, a direct financial stake by the state in a business, or a close nexus between the state and the alleged wrongful conduct."  *Standardbred Owners Ass'n v. Roosevelt Raceway Associates*, L.P., 985 F.2d 102, 105 (2d Cir. 1993).

In this case, Mr. Curanaj has alleged that the Cordones jointly engaged in action with the state officers.  *See, e.g*, Compl. ¶ 38.  He relies primarily on two cases, *Weintraub* and *Friedman v. New York City Admin. for Children's Services*, No. 04-CV-3077 (ERK), 2005 WL 2436219 (E.D.N.Y. Sept. 30, 2005).  Both *Weintraub* and *Friedman* contain broad language suggesting

that a civilian who makes a false statement to a police officer can be held liable for joint action under Section 1983.[10]

Both *Weintraub* and *Friedman* rely on an earlier case, *Coakley v. Jaffe*, 49 F. Supp. 2d 615 (S.D.N.Y. 1999).  *See Weintraub*, 423 F. Supp. 2d at 58; *Friedman*, 2005 WL 2436219 at *8.  But, for the purpose for which *Weintraub* and *Friedman* rely on it, *Coakley* is no longer good law.  *Coakley* was decided on April 23, 1999.  On August 18, 1999, the Second Circuit directly addressed joint participation of private and state actors under Section 1983 in *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d Cir. 1999).

In *Ginsberg*, the plaintiff alleged that, after a payment dispute in the defendant corporation's showroom, the manager "called the . . . Police Department to report the disturbance in the showroom and to request that the Police Department send someone to the showroom in case [the plaintiff] returned."  *Id.* at 270.  The *Ginsberg* panel held that "[the defendant's] provision of background information to a police officer does not by itself make [the defendant] a joint participant in state action under Section 1983."  *Id.* at 272.

The panel continued:

> If [the defendant] can be said to have acted jointly with [the Officer] on these facts, a private party would be considered a state actor responsible for subsequent, independent actions of a police officer whenever it legitimately calls for official assistance or protection.  Where, as here, a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct so as to render it a state actor under Section 1983.

*Id.*  It concluded:

---

[10] The *Weintraub* court stated that "[i]f a victim makes false statements to the police, with the intent to have an innocent person arrested in violation of his Fourth Amendment rights, she may not only be held accountable for false imprisonment under state tort law, but under federal law, for invoking the state's power to intentionally violate a citizen's constitutional rights."  423 F. Supp. 2d at 58.  The *Friedman* court stated that "[the defendant] was a willing participant in the scheme which set in motion by his false oral and written reports to [the state child services agency] and caused the initiation of the Neglect Proceeding that resulted in the suspension of plaintiff's parental rights over the course of more than half a year. . . . Accordingly, I conclude that, at least on this motion to dismiss, plaintiff has sufficiently pled the joint participation."  2005 WL 2436219 at *8.

> The fact that [the defendant] did not ask [the officer] to cease his role in inducing [the plaintiff] to pay, is also not enough to make [the defendant] a state actor absent any evidence of a plan, prearrangement, conspiracy, custom, or policy. . . . Section 1983 does not impose civil liability on persons who merely stand to benefit from an assertion of authority under color of law, but only on those who act under color of law.

*Id.* at 272-73 (quotation and citation omitted).

Neither *Weintraub* nor *Friedman* mention *Ginsberg* at all.  But *Ginsberg* nonetheless remains the law in this Circuit.  A more recent case, *Valez v. City of New York*, No. 08 Civ. 3875 (DLC), 2008 WL 5329974 at *3 (S.D.N.Y. Dec. 16, 2008), applied *Ginsberg* to facts similar to the instant case.  In *Valez*, the plaintiff alleged that he "was arrested at his home in the Bronx for planting marijuana in his yard.  The officers stated that they were acting 'on orders of' plaintiff's landlord[s].  The landlord[s] had given the police false information out of malice and in an effort to get [the plaintiff] ejected from the home he was renting."  *Id.* at *1.

The court held that the plaintiff had not stated a claim against the landlords for false arrest and could not amend his complaint to state a claim against them for malicious prosecution because his complaint "fail[ed] adequately to allege that [the landlords] were acting under color of state law."  *Id.*

The *Valez* court discussed *Ginsberg* and then explained:

> [The plaintiff's] complaint fails to allege facts from which it could be found that [the landlords] acted under the color of state law, as it does not allege facts suggesting that defendants and the police had any meeting of the minds or intent to conspire. The complaint alleges merely that the police arrested [the plaintiff] 'on orders of plaintiff's landlord,' that the police 'failed to properly investigate the [landlords'] claims,' and that 'Defendants conspired among themselves to deprive plaintiff of his constitutional rights.' These conclusory allegations are insufficient to give [the landlords] fair notice of the ground for asserting that they were state actors and for making a plausible claim that they undertook the joint activity with the police required to state such a claim.

*Id.* at *3.

Like the plaintiff in *Valez*, Mr. Curanaj alleges that the Cordones gave false information to the Officers out of malice, both in their initial reports and in their depositions; that the Officers failed to properly investigate the Cordones' claims; and that the Cordones and the Officers jointly violated his rights. But, as in *Valez* and *Ginsberg*, the Officers here had an independent basis to arrest and prosecute Mr. Curanaj.

Mr. Curanaj does not adequately allege a joint "plan, prearrangement, conspiracy, custom, or policy." *Ginsberg*, 189 F.3d at 272. Mr. Curanaj's attempt to construe Officer Gentner's comment that "even if the Cordones were lying or making things up, he was going to throw [Mr. Curanaj] in jail," as evidence of a joint plan or conspiracy is unavailing. That equivocal, isolated comment does not establish that they were acting in concert[11] and does not vitiate the arguable probable cause that was present at the time of the arrest. Indeed, the Complaint alleges no fewer than three instances in which the police declined to take action against Mr. Curanaj in response to a complaint by the Cordones. That is compelling evidence of the absence of a joint plan. The Cordones are "persons who merely stand to benefit from an assertion of authority," *id.* at 273, and did not act "under color of law" for the purpose of Section 1983.[12] Therefore, the Court GRANTS judgment to the Cordones on all of the federal claims against them.

---

[11] In fact, on its face the comment—"*even if* the Cordones were lying"—does not suggest a joint plan at all. Rather, it suggests that Officer Gentner did not reflexively credit the Cordones.

[12] The malicious abuse of process claim against the Cordones fails for the additional reason that it does not allege the necessary element of initiation of a proceeding. "[R]eporting a crime to law enforcement and giving testimony does not constitute 'initiation' of a criminal prosecution. Rather, the complainant must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act. Even providing false information does not constitute initiation of a criminal prosecution." *DeStefano v. Duncanson*, 08 Civ. 3419 (GBD), 2011 WL 651452 at *3 (S.D.N.Y. Feb. 10, 2011) (citing to *Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 439 (2d Cir.2008), and *Rothstein v. Carriere*, 373 F.3d 275, 293 (2d Cir. 2004)).

**E. Federal Claims against the Town**

On each of his claims, Mr. Curanaj includes the Town as a Defendant.  He has failed to state a valid Section 1983 claim against the municipality.

A municipality cannot be held liable under Section 1983 solely on a theory of *respondeat superior*.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  A Section 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom.  *Id.* at 690-91.  Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Connick v. Thompson*, — U.S. —, 131 S. Ct. 1350, 1360 (2011) ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell*, 436 U.S. at 692)).

The Second Circuit has established a two prong test for § 1983 claims brought against a municipality.  First, the plaintiff must prove "'the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official].'"  *Johnson v. City of New York*, No. 06 CV 09426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).  Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights.  Id.

To satisfy the first prong of the test on a motion to dismiss, a plaintiff must allege the existence of:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the

28

constructive knowledge of policy-making officials, or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases).

The only specific factual allegation Mr. Curanaj makes against the Town centers on Chief McMahon. He states that "Chief McMahon's refusal to take action to remedy the violations of law against [him] was part of the policy and practice of the Defendant Town to treat citizens differently on account of who they know and/or their national origin." Compl. ¶ 36. This conclusory claim faces the initial problem that there is no allegation that Chief McMahon even knew Mr. Curanaj's national origin. Indeed, as noted above, nowhere in his Complaint does he indicate what his national origin is, or who, if anyone, the Cordones "knew" in the Town government such that they could expect to receive preferential treatment.

But even ignoring those issues, the only allegation which could support any policy of bias against Mr. Curanaj is his allegation that "[o]n at least three occasions in early to mid 2009," the Curanajs raised concerns with Chief McMahon, who once responded that the disputes were civil in nature and twice ignored their complaints. *Id.* ¶ 37. Without further pleading, this allegation does nothing to support a practice or policy rather than three isolated incidents. Moreover, the Complaint alleges numerous instances in which the Town police told *the Cordones* that their disputes were civil in nature or otherwise decided not to take action on their allegations. *See, e.g.*, Compl. ¶ 14. If anything, Mr. Curanaj and the Cordones were treated *identically* by the Town police. In addition, there simply is no requirement that police authorities take any action

when presented with a complaint. *See Newton v. City of New York*, 566 F.Supp.2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation.").

Therefore, Mr. Curanaj has not alleged a municipal policy or practice that could state a claim under Section 1983. *See Iqbal*, 556 U.S. at 686 (explaining that a general, conclusory allegation of discriminatory intent does not state a policy under Section 1983). Accordingly, the Court GRANTS judgment to the Town on all of the federal claims against it.

**F. State Law Claims**

Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise jurisdiction over any non-federal claims over which it could have supplemental jurisdiction if the Court has dismissed all of the claims over which it has original jurisdiction. Subject matter jurisdiction in the instant action is based on federal question, 28 U.S.C. § 1331, and the jurisdictional counterpart to § 1983 for claims alleging a deprivation of "equal rights." 28 U.S.C. § 1343(3). Having disposed of all of Mr. Curanaj's federal claims, it would be inappropriate to adjudicate his state law claims. Therefore, the Court declines to retain jurisdiction over the state law claims and dismisses them without prejudice. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (stating that, if the federal claims are disposed of before trial, "the state claims should be dismissed as well.").

**III. CONCLUSION**

For the foregoing reasons, the Court GRANTS the motion of Sergeant Gentner, Officer Sansone, Chief McMahon, and the Town for judgment on the pleadings on all of the federal claims against them. The Court declines to retain supplemental jurisdiction over the state law

claims against them and therefore DISMISSES those claims without prejudice. The Clerk of the Court is respectfully directed to terminate this motion (Doc. 24).

The Court also GRANTS the motion of Peter and Deborah Cordone for judgment on the pleadings on all of the federal claims against them. The Court declines to retain supplemental jurisdiction over the state law claims against them and therefore DISMISSES those claims without prejudice. The Clerk of the Court is respectfully directed to terminate this motion (Doc. 27).

Because there is no federal liability for Defendants and the state claims have been dismissed, the Court also DISMISSES the Defendants' crossclaims against each other. The Clerk of the Court is respectfully directed to close this case.

It is SO ORDERED.

Dated: September 19, 2012
White Plains, NY

Edgardo Ramos, U.S.D.J.